Steve Biddle; AZ Bar No. 012636
R. Shawn Oller; AZ Bar No. 019233
LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016
Telephone: 602-474-3600
Facsimile: 602-957-1801
E-Mail: sbiddle@littler.com
soller@littler.com
Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Equal Employment Opportunity Commission,

Plaintiff,

v.

Go Daddy Software, Inc.,

Defendant.

Case No. CV 04 2062 PHX DGC

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Go Daddy Software, Inc. ("Go Daddy") hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Motion is supported by the attached memorandum, Defendant's Statement of Facts in Support of Its Motion for Summary Judgment, deposition excerpts, and all other papers and pleadings on file herein, all of which are incorporated herein by reference.

## I. STATEMENT OF RELEVANT FACTS

### A. The Parties.

Defendant Go Daddy was founded in 1997 by Bob Parsons (SOF #1). The Arizona company is the world's largest domain name registrar. Youssef Bouamama ("Bouamama"), who is Muslim, was born in Morocco and moved to the United States in 1990 (SOF #2). Plaintiff, the Equal Employment Opportunity Commission, has filed the present lawsuit on Bouamama's behalf alleging that Go Daddy discriminated against him based on his national

origin (Moroccan)[1], his religion (Muslim), and that Go Daddy retaliated against Bouamama (SOF #3). The relevant factual allegations are set forth below.

**B. Go Daddy Hires and Promotes Bouamama.**

Go Daddy interviewed and hired Bouamama shortly before the terrorist attacks of September 11, 2001, and he physically began working for the company on September 20, 2001. Between September 2001 and December 2001, Bouamama worked as a technical support representative for Go Daddy through a temporary agency. His duties included troubleshooting customer problems, by telephone or e-mail (SOF #4-6). Bouamama ultimately reported to Brett Villeneuve, Go Daddy's Operations Manager (SOF #7).

Bouamama's early employment with Go Daddy was relatively uneventful. Shortly after starting as a temporary employee, Bouamama asked Go Daddy to change his shift to accommodate his observance of the Muslim holy month of Ramadan. According to Bouamama, Go Daddy granted his request – "no problem" (SOF #8-9). After 90 days, on December 13, 2001, Villeneuve hired Bouamama as one of Go Daddy's own employees. Go Daddy also raised Bouamama's pay from $12.00/hour to $14.00/hour (SOF #10-11). Bouamama describes an incident, occurring shortly after being hired as a Go Daddy employee, which he believes supports his discrimination claims. According to Bouamama, Villeneuve heard him speaking French to a customer on the telephone. Afterwards, Villeneuve asked him what other languages he spoke. Bouamama told Villeneuve that he spoke Arabic, English, and French. Allegedly, Villeneuve then asked Bouamama where he was from and what religion he practiced, to which Bouamama replied Morocco and Muslim, respectively (SOF #12-13). This was the extent of their conversation.

In early 2002, Go Daddy began to create a new "Team Lead" position as the company moved its emphasis from technical support to sales (SOF #14). The Team Lead position was a "working" supervisory position in that Team Leads supervised five or six representatives

---

[1] Plaintiff's lawsuit alleges that Bouamama's national origin is "Moroccan/Middle Eastern" (Complaint). Bouamama concedes, however, that he was not born in the Middle East, that none of his relatives are from the Middle East, and has never visited the Middle East (Id.).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

and were also responsible for responding to customers. On February 25, 2002, Villeneuve promoted Bouamama to the position of Team Lead effective March 5, 2002. Go Daddy gave Bouamama another raise, increasing his pay from $14.00/hour to $16.00/hour. As a Team Lead, Bouamama reported directly to Villeneuve (SOF #15-17).

**C. Derogatory Comments During Bouamama's Tenure As a Team Lead.**

Bouamama alleges that during the four months he worked as a Team Lead, he heard two types of discriminatory comments that he also believes support his discrimination claims. First, Bouamama believes that Villeneuve made a derogatory comment referencing the "people of Afghanistan, to the Muslim people, and to the terrorists," although he ultimately conceded "I don't remember" what the comment was (SOF #18). Bouamama did not write this comment down nor did he complain to anyone about Villeneuve's alleged comment (SOF #19). This, however, was a single, isolated incident (SOF #20). Though Bouamama was unclear about what Villeneuve may have said about Muslims in general, he concedes that Villeneuve did not direct any derogatory comments about Muslims to him and that he did not hear anyone else make derogatory comments. Bouamama also concedes that Villeneuve did not make any derogatory comments about his national origin (SOF #21-22).

The second type of "comment" occurred when Go Daddy asked Bouamama to review web sites hosted by Go Daddy that were written in Arabic and look for any indication that they were sponsored by terrorists (SOF #23). Bouamama acknowledges that he was the only employee who spoke or read Arabic at Go Daddy, but states that he was not "comfortable" reviewing the web sites. Of the four to six web sites that Bouamama reviewed, he claims he did not find any that contained inappropriate material and none of the web sites written in Arabic were shut down by Go Daddy (SOF #24-25). Again, Bouamama never voiced his opposition to using his Arabic-language skills to review these websites.

**D. Villeneuve Promotes Bouamama to Inbound Sales Manager.**

After Bouamama had worked just four months as a Team Lead, Villeneuve promoted him to the position of Inbound Sales Manager effective July 11, 2002 (SOF #26). As Inbound Sales Manager, he provided a support role to the sales representatives. He was

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

responsible for, among other things, preparing sales reports and setting up sales contests. Again, Go Daddy increased Bouamama's pay from $16.00/hour to $46,000/year (SOF #27-28). Villeneuve viewed Bouamama's promotion to Inbound Sales Manager as a win/win situation because Bouamama dealt less with customers and employees directly (SOF #29).[2] He continued to report to Villeneuve, without incident (SOF #30).[3]

**E. Go Daddy Reorganizes its Call Center.**

On April 1, 2003, Go Daddy hired Craig Franklin as its new Director of Call Center Operations (SOF #31). Villeneuve continued as Operations Manager, reporting to Franklin (SOF #32). Franklin was hired, in part, because of his expertise in call center operations and was hired "to bring in new ideas and bring the company [to] another level" (SOF #33). As part of this plan, Go Daddy reorganized its call center by consolidating 15 management positions into four brand-new Sales Supervisor positions. The positions affected included all 13 Team Leads, the Weekend Operations Manager position, and the Inbound Sales Manager position (SOF #34-35). Each of the affected employees was encouraged to interview for one of the new Sales Supervisor positions. Fourteen employees, including Bouamama, applied (SOF #36).[4] Before the interviews, Go Daddy notified each of the applicants that if they chose not to apply for the Sales Supervisor position or, alternatively, if they were not selected for the position, they could take a sales representative position (with a corresponding pay cut) or leave the company with a severance package (SOF #37).

---

2 Villeneuve described Bouamama as "very knowledgeable" but had observed that Bouamama could be "gruff" when dealing with co-workers and said that customers had previously complained about Bouamama's attitude (Id.). Villeneuve had verbally counseled Bouamama about the way he presented himself which Bouamama described as "motivating" but Villeneuve described as "intimidating." (Id.). With Bouamama's promotion to Inbound Sales Manager, Villeneuve felt that he could worry less about Bouamama being "gruff" with customers/employees while, at the same time, Bouamama could utilize his math skills (Id.).

3 Indeed, in late November 2002, Bouamama took an extended vacation to Morocco (Id.). When he returned from Morocco, he brought early Christmas gifts for, among others, Bob Parsons and Villeneuve (Id.). In addition, Bouamama bought additional Christmas gifts for Parsons, Villeneuve, and Barb Rechterman, Go Daddy's Executive Vice-President (Id.). Bouamama also received Christmas gifts from, among others, Villeneuve (Id.).

4 One individual did not interview for a Sales Supervisor position, and instead accepted a sales representative position with a corresponding pay cut (Id.).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

**F. Go Daddy Interviews Bouamama for the Sales Supervisor Position.**

The 14 interviews were conducted on Wednesday, April 9, 2003 and Thursday, April 10, 2003 by a three-person interview panel comprised of Slezak, Franklin, and Villeneuve (SOF #38). During the interviews, the panel used a standard series of questions (SOF #39). Bouamama was the first applicant interviewed (SOF #40).

To put it bluntly, the panel members felt that Bouamama's interview went poorly. For example, Slezak testified that Bouamama's responses were very general, he could not articulate his answers very well, seemed "standoffish," and gave the impression that he was entitled to one of the Sales Supervisor positions. Franklin echoed Slezak's comments and added that, during Bouamama's interview, it was a lot of "me, me, me" instead of responding to the questions posed (SOF #41).

In support of his lawsuit, Bouamama alleges that, the following day, Franklin asked him where he was from and what religion he practiced. When Bouamama responded that he was from Morocco and was Muslim, Franklin allegedly said "Well, you're lucky that I like you." (SOF #42). Again, according to Bouamama, this was the extent of their conversation. Bouamama testified that he reported this conversation to Slezak either that day or the following day and that she promised to look into it (SOF #43).

**G. Go Daddy Does Not Select Bouamama for a Sales Supervisor Position.**

The panel made the final decision regarding the candidates and all applicants were notified, privately, on Friday, April 11, 2003, and Monday, April 14, 2004 (SOF #44).[5] Bouamama was not selected for a Sales Supervisor position because of his poor interview and difficulties interacting with other employees and customers, as compared to the successful candidates (SOF #45).[6] Villeneuve testified that he felt Bouamama did not have the demeanor necessary, comparatively, to manage and motivate people. He would not put

---

[5] During this process, the panel determined that two additional Supervisors were needed, one to manage the web board and one to manage the retention group (Id.). Decisions about these two additional positions were made on that same day using the same pool of applicants (Id.).

[6] Each of the more specific reasons for Bouamama's non-selection is set forth in Go Daddy's responses to Bouamama's Charge of Discrimination (Id.).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

him in a position where he had to be responsible for motivating people again. Villeneuve believed that Bouamama was not a "go-to" person for the other employees (SOF #46-47).

The panel met with each of the unsuccessful applicants individually to notify them of the decision and offer the choice of accepting a sales representative position or leaving the company with a severance package. All eight unsuccessful applicants accepted a sales representative position – except Bouamama – who rejected the offer (SOF #48-49).

**H. Go Daddy Offers Bouamama a Statistical Analyst Position.**

Before the Sales Supervisor positions were formally announced to the entire company, Bob Parsons met with his executive staff, including Barb Rechterman, to discuss various agenda items (SOF #50). During the meeting, Parsons told his executive staff "Youssef is a good guy, we should see if we can find a place for him." Rechterman was under the impression that Parsons liked Bouamama and "wanted to find a home" for him at Go Daddy (SOF #51-52). After the meeting, Rechterman asked Parsons whether Bouamama would be capable of analyzing statistics in her department because she was aware that he had a math degree (SOF #53). Parsons agreed "we should give it a try" (SOF #54).

On the afternoon of Tuesday, April 15, 2003, the Sales Supervisor positions were formally announced to all Go Daddy employees. Before the formal announcement, Bouamama met with Go Daddy's President, Bob Parsons, and Parsons told him that he was not getting one of the Sales Supervisor positions (SOF #55-56). During the meeting, Parsons offered Bouamama the opportunity to apply for a position doing "some statistical analysis" for the company (SOF #57). Bouamama said he was "happy" following the conversation with Parsons because he was going to be doing something different (SOF #58). Parsons did not offer this opportunity to the other unsuccessful applicants because he did not have an independent friendship with them, as he had with Bouamama (SOF #59).

On Wednesday, April 16, 2003, Rechterman gave Bouamama an assignment to assess whether he would have the appropriate skill set for a statistical analyst position (SOF #60). According to Rechterman the assignment used simple mathematical calculations such as

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

calculating the call center's call volume-to-order conversion (SOF #61). By her estimation, she gave Bouamama "ample" time to complete the project (SOF #62).

Bouamama concedes that he did not complete the project by the original deadline, that Rechterman then gave him additional time, and that he handed in the final project more than two hours late (SOF #63). According to Rechterman, the final calculations were not accurate because Bouamama had done the project "wrong" (SOF #64). Afterwards, Rechterman told Parsons that Bouamama was not going to work out in a statistical analyst role (SOF #65).

**I. Bouamama's Separation from Go Daddy.**

The following day, Thursday, April 17, 2003, Bouamama called in sick to work because he was "depressed" (SOF #66). At approximately 9:00 a.m., Slezak called Bouamama at home and asked him to come into the office. Bouamama agreed to come in at 2:30 p.m. (SOF #67).[7] When he arrived, Bouamama met with Franklin and Slezak, who allegedly told him he was being terminated (SOF #68). During the meeting, Bouamama was offered a severance agreement which he refused to sign (SOF #69). Bouamama testified that he "didn't have any intentions to sign the agreement" because "[he] wanted to sue the company" (SOF #70). This lawsuit followed.

## II. LEGAL ANALYSIS

Against this factual background, Plaintiff alleges three causes of action, all arising under Title VII: (1) national origin discrimination, (2) religious discrimination, and (3) retaliation (Complaint, ¶¶ 7-8). Each of Plaintiff's allegations are addressed below. Even accepting Bouamama's version of disputed facts, summary judgment is appropriate.

**A. Plaintiff's Time-Barred Allegations Should be Dismissed.**

Title VII requires that a plaintiff timely file a charge of discrimination with the EEOC within 300 days of the discriminatory conduct prior to bringing a claim in federal court. See 42 U.S.C. § 2000e-5(e); Santa Maria v. Pacific Bell, 202 F.3d 1170, 1176 (9th Cir. 2000). Failure to file a timely charge prevents a person from litigating that claim (Id.).

---

[7] In the interim, Bouamama drove to the EEOC, met with an investigator, and filed the Charge of Discrimination that preceded this lawsuit (Id.).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

In its Complaint, Plaintiff alleges that "[s]ince at least 2001 Defendant has engaged in unlawful employment practices . . . by discriminating against Youssef Bouamama . . . ." (Complaint, ¶ 7). Bouamama, however, filed his charge of discrimination on April 29, 2003. Thus, any discrete incidents of discrimination and/or retaliation that occurred before July 3, 2002 (i.e., 300 days before April 29, 2003) are time-barred as a matter of law and should be dismissed. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).

**B. Applicable Law.**

To survive summary judgment, Plaintiff must first establish a *prima facie* case of discrimination or retaliation. See Chuang v. Univ. of Calif. Davis, Bd. of Trustees, 225 F.3d 1115, 1123 (9th Cir. 2000). If Plaintiff is able to make this *prima facie* showing, the burden of production shifts to Go Daddy to articulate a legitimate, non-discriminatory reason for the challenged actions. See id. at 1124. Once established, the burden shifts back to Plaintiff to show that the reasons given by Go Daddy are a pretext for illegal discrimination or retaliation. See id. At the pretext stage, Plaintiff must present specific and substantial evidence in order to create a triable issue of material fact. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998). At all times, Plaintiff bears the ultimate burden of proving that Go Daddy intentionally discriminated or retaliated against Bouamama. Id. at 1220.

**C. Plaintiff Cannot Rebut Go Daddy's Legitimate, Nondiscriminatory Reasons for Not Promoting Bouamama to Sales Supervisor.**

As an initial matter, Plaintiff cannot establish that Go Daddy's legitimate, nondiscriminatory reasons for not promoting Bouamama to a Sales Supervisor position are a pretext for national origin and/or religious discrimination and/or retaliation. The employer's articulation of a facially nondiscriminatory reason shifts the burden back to the plaintiff to show that the employer's reasons were a pretext for illegal discrimination. See Godwin., 150 F.3d at 1220. Although Plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both "specific" and "substantial." See Godwin, 150 F.3d at 1222. Plaintiff "may establish pretext through evidence showing that [the employer's] explanation is unworthy of belief or through evidence showing that discrimination more likely motivated

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

the decision." Pottenger v. Potlach Corp., 329 F.3d 740, 746 (9th Cir. 2003). Finally, the decisions of the employer need not meet the approval of a judge or jury as long as the decisions are not based on illegal considerations, such as national origin, religion, or illegal retaliation. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The court does not sit as a "super personnel department" reviewing each employment action to determine if it was fair or arbitrary; rather, the Court's role is to determine if there is legally sufficient evidence of discrimination to allow the claim to survive a motion for summary judgment. See Green v. Maricopa County Community College Dist., 265 F. Supp.2d 1110, 1128 (D. Ariz. 2003).

**1. Plaintiff Has No Evidence that Go Daddy's Explanation is Unworthy of Belief.**

Go Daddy has articulated several legitimate, nondiscriminatory reasons why Bouamama was not selected for the Sales Supervisor position. Go Daddy, therefore, has met its burden of production. Godwin, supra. Plaintiff is now required to rebut each legitimate, nondiscriminatory reason offered by Go Daddy in order to avoid summary judgment. See Adreai v. First Colonial Bankshares Corp., 154 F.3d 389, 399 (7th Cir. 1998) ("The existence of a genuine issue of triable fact with respect to some of the reasons for the discharge proffered by the employer is of no consequence as long as at least one reason is uncontested."). Plaintiff cannot meet this burden.

Bouamama conceded during his deposition that he has no evidence to rebut Go Daddy's articulated reasons. Specifically, Bouamama conceded he was "not in any position to tell you that I'm better qualified than" the other applicants, does not know how their interviews went, does not know their disciplinary history, and did not have access to their personnel files or resumes (SOF #71). Thus, Bouamama admits that he has no evidence to rebut any of the legitimate, nondiscriminatory reasons offered by Go Daddy.

**2. Plaintiff's Evidence That Discrimination More Likely Motivated Go Daddy's Decision is Insufficient to Avoid Summary Judgment.**

To show discriminatory motive, Plaintiff relies primarily upon the three separate comments allegedly made by Villeneuve and Franklin, as well as the fact that Go Daddy

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

asked Bouamama to review Arabic-language websites. Even accepting Bouamama's version of the events as true – which Go Daddy disputes – this evidence is insufficient.[8]

For comments in the workplace to provide sufficient evidence of intentional discrimination, they must be direct and unambiguous. In addition, there must be evidence of a causal connection between the isolated remarks and the adverse employment action. Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993); Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir. 1990). Plaintiff's comments fail to meet these requirements.

Two of the alleged "comments" are non-discriminatory on their face. Plaintiff's allegation that – Villeneuve first, and then Franklin – asked Bouamama where he was from, what languages he spoke and what religion he practiced is no evidence of discrimination. Title VII was not meant to stifle all workplace discussion. See, e.g., Rivera v. Puerto Rico Aqueduct and Sewers Authority, 331 F.3d 183 (1st Cir. 2003) (noting that Title VII does not prohibit honest disagreement about religion in the workplace). Nor does this type of inquiry demonstrate any type of discriminatory animus. In addition, both of Villeneuve's comments – allegedly made between December 2001 and July 2002 – occurred approximately a year before any of the employment decisions at issue in this case and, therefore, are unrelated to the Sales Supervisor position or "termination." Nidds v. Schindler Elevator Corp., 113 F.3d 912 (9th Cir.) (supervisor's comment, unrelated to termination, was "weak evidence" insufficient to avoid summary judgment), cert. denied, 522 U.S. 950 (1997). Moreover, after Villeneuve allegedly made these comments, he promoted Bouamama – twice – raising his pay on both occasions.[9] Finally, the fact that Go Daddy asked Bouamama to utilize his

---

[8] Plaintiff's has no evidence that Go Daddy refused to promote Bouamama to the position of Sales Manager in retaliation for engaging in protected activity. All of Plaintiff's evidence relates to alleged discrimination based upon Bouamama's national origin and/or religion.

[9] With regard to Villeneuve's alleged comments, Plaintiff's burden is even greater. The Ninth Circuit has specifically held that where an actor is responsible for previously promoting the plaintiff, a strong inference arises that the actor is not biased against the protected classes to which the plaintiff belongs. Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1096 (9th Cir. 2005); Harstel v. Keys, 87 F.3d 795, 804 n. 9 (6th Cir. 1996), cert. denied, 519 U.S. 1055 (1997). Here, Villeneuve was the same actor who previously promoted Bouamama – first to Team Lead and then to Inbound Sales Manager. The same-actor inference is a "strong inference" that a court must take into account on a summary judgment motion. Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 271 (9th Cir. 1996).

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

language skills to review Arabic websites for improper content is no evidence of discrimination. See Perez v. F.B.I., 707 F. Supp. 891, 912 (W.D. Tex. 1988) (FBI's informal or formal expectation that Hispanic Spanish speaking agents will assist a fellow agent with translating does not violate Title VII), aff'd, 956 F.2d 265 (5th Cir. 1992).

**D. Plaintiff's Termination Claims Fail As a Matter of Law.**

Plaintiff next alleges that Go Daddy terminated Bouamama because of his national origin and/or religion and/or because he engaged in protected activity (Complaint ¶ 7-8). Plaintiff alleges that Bouamama was both "constructively discharged" and that Go Daddy "fired" him. Although Plaintiff changes its allegations, the end result is the same.

**1. Plaintiff's "Constructive Discharge" Claim Fails.**

"To establish a claim for constructive discharge, [a plaintiff] must show there are triable issues of fact as to whether a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." Schnidrig v. Columbia Machine, Inc., 80 F.3d 1406, 1411 (9th Cir.), cert. denied, 519 U.S. 927 (1996). The Ninth Circuit has observed that discrimination "policies are best served when the parties, if possible, attack discrimination within the context of their existing employment relationships." Watson v. Nationwide Ins. Co., 823 F.2d 360, 361 (9th Cir. 1987). Accordingly, "to establish that he was constructively discharged, a plaintiff must at least show some aggravating factors, such as a continuous pattern of discriminatory intent." Thomas v. Douglas, 877 F.2d 1428, 1434 (9th Cir. 1989). Plaintiff has no such evidence.

Bouamama enjoyed a successful career with Go Daddy. Go Daddy hired him first as a temporary agency employee, then as a Go Daddy employee, then promoted him to Team Lead, and then promoted him to Inbound Sales Manager – all within the span of less than a year. When Go Daddy had to reorganize its management structure, Bouamama suffered a temporary setback in his career path – along with seven other management-level employees. The undisputed evidence shows that ***every other*** unsuccessful applicant for the Sales Supervisor position accepted Go Daddy's offer to return to the position of sales representative. The fact that – of the eight different candidates – Bouamama was the only

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

one who refused to return to the position of sales representative belies his claim that his working conditions were "intolerable" and negates an inference that Go Daddy engaged in a "continuous pattern of discriminatory intent" as a matter of law.

**2. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation With Regard to his "Firing" or Promotion Claim.**

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that (1) he engage in protected activity, (2) the employer subjected him to an adverse employment action and, (3) there was a causal link between the protected activity and the employer's action. See Pool v. Vanrheen, 297 F.3d 899, 910 (9th Cir. 2002).

For the first element, Title VII protects employees who oppose discrimination or participate in the Title VII process. 42 U.S.C. § 2000e-3(a). Ambiguous comments, however, do not constitute protected activity as a matter of law. Pool, supra. Bouamama alleges that after his interview, Franklin asked him where he was from and what religion he practiced. When Bouamama responded that he was from Morocco and was Muslim, Franklin allegedly said, "Well, you're lucky that I like you." Bouamama says he told Slezak about this conversation either that day or the following day and that she promised to look into it. Importantly, Bouamama did not tell Slezak that that he felt he had been discriminated against or express any fear that Franklin would discriminate against him in the future. Plaintiff's allegation, even if accepted as true, is insufficient to avoid summary judgment. Pool, supra (female deputy's letter alleging "good ole boy" network, the importance of diversity in the Sheriff's office, and her own struggles to attain diversity insufficient where letter did not allege unlawful discrimination).

Plaintiff also cannot establish the third element of its *prima facie* case – a causal connection. In support of this element, Plaintiff relies entirely on the timing of Bouamama's termination. That is, he was "fired" only a few days after he allegedly told Slezak about Franklin's questions. Plaintiff, however, ignores other more salient facts.

While temporal proximity, alone, can create an inference of a causal link if the proximity is "very close," intervening events separating the protected activity and the

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

adverse employment action reduces the persuasive value of even the strongest temporal evidence. See, e.g., Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir. 2005) (holding that intervening events "eroded" the causal connection suggested by the employee), __U.S.__, 2006 WL 37092 (U.S. Jan. 9, 2006). Here, Go Daddy offered Bouamama the opportunity to apply for another position ***after*** he unsuccessfully bid for the Sales Supervisor position. Parsons offered this opportunity to Bouamama – and no one else – because of their admitted friendship. Though Bouamama could not demonstrate he was capable of performing the offered position, Go Daddy's offer is an intervening event, negating any causal connection between his so-called protected activity and his ultimate termination. See Manatt v. Bank of America, NA, 339 F.3d 792, 802 (9th Cir. 2003) (affirming summary judgment because intervening events of pay raise and selection for prestigious assignment negated causal connection).

**3. Plaintiff's "Firing" Was Unrelated to His National Origin/Religion.**

Plaintiff's allegation that Go Daddy "fired" Bouamama because of his national origin and/or religion must likewise fail (Complaint, ¶ 7-8).[10] To establish a *prima facie* case of national origin/religious discrimination, Plaintiff must establish that: (1) Bouamama was a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) similarly situated individuals outside his protected class were treated more favorably. See Godwin, 150 F.3d at 1220. Plaintiff can neither meet its *prima facie* case nor can it rebut Go Daddy's legitimate nondiscriminatory reasons.

Plaintiff cannot establish the final element of its *prima facie* case – that similarly situated individuals outside his protected class were treated more favorably. At a fundamental level, Plaintiff has no evidence regarding the religions or national origins of the other unsuccessful candidates. Further, to the extent Bouamama alleges he was ultimately "fired" – he was offered ***more*** opportunities than any of the other unsuccessful candidates.

[10] Plaintiff's allegations in its Complaint that Go Daddy "fired" Bouamama on one hand and that Bouamama felt compelled to resign (i.e., was constructively discharged) on the other hand are mutually exclusive. Because Plaintiff continues to prosecute both of these mutually exclusive claims, Rule 11 requires it now to provide factual support for its allegations.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

Plaintiff also cannot rebut Go Daddy's legitimate nondiscriminatory reason for Bouamama's "firing." Here, the panel reasonably believed that Bouamama had rejected the offer of returning to a sales representative position. Go Daddy anticipates that Plaintiff will argue that the panel was "mistaken" and that Bouamama did not *actually* reject the sales representative position. Plaintiff's argument misses the point. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054 (9th Cir. 2002). In Villiarimo, the plaintiff attempted to show pretext by attacking the credibility of the three eye-witnesses who disputed her version of an accident that resulted in her termination. Both the trial court and the appellate court held that Villiarimo's attacks missed the point. In affirming summary judgment for the employer, the Ninth Circuit explained that "[i]n judging whether [the employer's] proffered justifications were false, it is not important whether they were objectively false (e.g., whether Villiarimo actually lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Id. at 1063. Thus, the court affirmed summary judgment because the plaintiff did not present any evidence that the employer did not honestly believe its proffered reasons for the plaintiff's termination. Id.

Here, as in Villiarimo, Plaintiff must do more than argue that Bouamama did not *actually* reject the sales representative position. Plaintiff must produce evidence that the panel did not honestly believe that Bouamama had rejected the offered sales representative position. Because Plaintiff cannot show that the panel did not reasonably believe that Bouamama had rejected the sales representative position, summary judgment is appropriate.

### E. Plaintiff's "*Per Se* Retaliation" Claim Fails as a Matter of Law.

Plaintiff finally alleges that when Go Daddy offered Bouamama "a separation agreement which included a provision conditioning the receipt of severance benefits on the waiver of the right to file a charge with a federal agency," Go Daddy's offer constituted *per se* retaliation (Complaint, ¶ 18). Plaintiff's claim should be dismissed as a matter of law.

#### 1. Plaintiff's allegations fail to state a cause of action.

The Ninth Circuit has never adopted, nor indicated that it would adopt, the so-called *per se* retaliation cause of action urged by Plaintiff. Other courts, in similar circumstances,

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

have held that "at most . . . a provision that purports to, for example, alter the EEOC's rights to pursue and investigate a claim that is filed, is unenforceable." Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 289-90 (3rd Cir. 2003); E.E.O.C. v. Cosmair, Inc. L'Oreal Hair Care Division, 821 F.2d 1085 (5th Cir. 1987) (waiver of right to file a charge is void). Even then, the presence of the unenforceable language would not void the entire contents of an otherwise valid release. Wastak, supra.

Go Daddy is not aware of, and Plaintiff has not identified, any controlling authority for the proposition that a separation agreement which included a provision conditioning the receipt of severance benefits on the waiver of the right to file a charge with a federal agency creates a private cause of action for *per se* retaliation. The court should reject Plaintiff's invitation to create a new cause of action under Title VII.[11]

**2. Plaintiff fails to establish a *prima facie* case of *per se* retaliation.**

Even if Plaintiff could cite any controlling precedent that a *per se* retaliation cause of action exists in the Ninth Circuit, Plaintiff would still be unable to establish a *prima facie* case supporting that cause of action and, therefore, Plaintiff's claim should be dismissed. First, and as outlined above, Bouamama never engaged in any protected activity. Second, Plaintiff cannot establish that simply *offering* Plaintiff a severance agreement in exchange for his agreement not to file a charge of discrimination constitutes an adverse employment action. See Hansen v. Vanderbilt Univ., 961 F. Supp. 1149 (M.D. Tenn. 1997) (requiring employee to withdraw EEOC charge in exchange for settlement was not an adverse employment action as a matter of law). Finally, there is no evidence between Plaintiff's alleged protected activity and any adverse employment action. The undisputed evidence shows that each unsuccessful candidate – not just Bouamama – would have been offered

[11] Go Daddy anticipates that Plaintiff will rely upon a single case from the Northern District of Ohio, E.E.O.C. v. Sundance Rehabilitation Corp., 328 F. Supp.2d 826 (N.D. Ohio 2004). That case, however, is not controlling authority and has never been cited for the proposition advanced by Plaintiff (or any other proposition) by any other court. Moreover, Plaintiff's argument has been rejected by other courts. See E.E.O.C. v. Sears, Roebuck and Co., 857 F. Supp. 1233, 1239 (N.D. Ill. 1994), modified on other grounds, 883 F. Supp. 211 (N.D. Ill. 1995); Hansen v. Vanderbilt Univ., 961 F. Supp. 1149, 1153 n. 9 (M.D. Tenn. 1997).

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

severance agreements had they not chosen to remain with the company. Further, Bouamama had no intention of signing the agreement because he wanted to sue the company.

**F. Go Daddy Cannot Be Held Liable for Punitive Damages Because That Is Contrary to Go Daddy's Good Faith Efforts to Comply with Title VII.**

Plaintiff's Complaint includes a claim for punitive damages (Complaint). In response, Go Daddy's Answer alleges that Plaintiff is not entitled to punitive damages because the imposition of such damages would be contrary to Go Daddy's good faith efforts to comply with Title VII (Answer, p. 4). Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999).

In Kolstad, the Supreme Court established a three-part inquiry to address the standard for permitting a jury to consider punitive damages in Title VII employment discrimination matters. Kolstad, supra. To succeed on a claim for punitive damages, the plaintiff must: (1) prove that the employer engaged in a discriminatory practice with malice or a reckless indifference to the federally protected rights of an aggrieved individual; (2) prove that liability is properly imputed to the employer; and (3) defeat the employer's affirmative defense that it made good faith efforts to comply with Title VII. Kolstad, 527 U.S. at 534-35. Go Daddy moves for summary judgment with respect to the third element.[12] For Go Daddy to establish the good-faith defense under Kolstad, it must "at least adopt antidiscrimination policies, make a good faith effort to educate its employees about these policies, and make good faith efforts to enforce the policy." Winarto v. Toshiba Am. Elec. Components, Inc., 274 F.3d 1276, 1292 (9th Cir. 2001), cert. denied, 537 U.S. 1098 (2003).

As a threshold matter, Go Daddy has adopted anti-discrimination (EEO) and anti-harassment policies. Written policies were implemented in the Spring of 2002. All Go Daddy policies are published on the Go Daddy portal, which is accessible to all employees (SOF #72). Go Daddy's policies prohibit discrimination and harassment, provide protection against retaliation, and provide an effective complaint process that requires immediate

[12] Under Kolstad, if the discriminatory actions of the managerial employees are contrary to the employer's "good faith efforts to comply with Title VII," then the employer is not liable for punitive damages for those discriminatory acts, regardless of whether the managerial employees acted with malice or reckless indifference. Kolstad, 527 U.S. at 545.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

investigation and the appropriate corrective action (SOF #73). In addition, Go Daddy has made a good faith effort to educate its employees regarding its anti-discrimination and harassment policies. All employees receive new hire training, which interactively discusses all Go Daddy policies, including the EEO and anti-harassment policies (SOF #74). In addition, managers receive ongoing, interactive training on EEO and harassment issues (SOF #75-76). Go Daddy also makes good faith efforts to enforce its policies by requiring managers to address and report harassment/discrimination complaints. Go Daddy's Human Resources Department immediately investigates all harassment/discrimination complaints, monitors its managers' conduct to ensure compliance, and keeps records of all complaints (SOF #77-80). Because Go Daddy provides significantly more information and training regarding EEO matters than is required by the Ninth Circuit to establish that it complies with Title VII, it is entitled to summary judgment on the EEOC's claim for punitive damages.

## III. CONCLUSION

For the foregoing reasons, Go Daddy respectfully requests that the Court grant its motion for summary judgment, dismissing each of Plaintiff's claims as a matter of law.

DATED this 19th day of January, 2006.

/s/ R. Shawn Oller
Steven G. Biddle
R. Shawn Oller
LITTLER MENDELSON, P.C.
Attorneys for Defendant

I hereby certify that I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following if CM/ECF registrants, and mailed a copy of same to any non-registrants this 19th day of January, 2006, to:

P. David Lopez, Trial Attorney
Lucila G. Rosas, Trial Attorney
Equal Employment Opportunity Commission
3300 North Central Avenue, Suite 690
Phoenix, AZ 85012-9688
*Attorneys for Plaintiff*

/s/ DJorgensen

Firmwide:80698502.1 048902.1002